F I L E D
Clerk
District Court

JUN 20 2023

for the Northern Mariana Islands
By_____
(Deputy Clerk)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN MARIANA ISLANDS**

| | |
|---|---|
| **ÖZCAN GENÇ, HASAN GÖKÇE, and SÜLEYMAN KÖŞ, on behalf of themselves and all others similarly situated,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**IMPERIAL PACIFIC INTERNATIONAL (CNMI), LLC and IMPERIAL PACIFIC INTERNATIONAL HOLDINGS LTD.,**<br><br>**Defendants.** | **Case No. 1:22-cv-00002**<br><br><br>**DECISION AND ORDER DENYING MOTION TO DISMISS SECOND AMENDED COMPLAINT** |

Previously, the Court granted Defendant Imperial Pacific International (CNMI), LLC's ("IPI") motions to dismiss the original complaint and the first amended complaint ("FAC"), but granted Plaintiffs leave to amend both times. (Mem. Decision Granting Mot. Dismiss FAC 1, ECF No. 34.) Plaintiffs Özcan Genç, Hasan Gökçe, and Süleyman Köş (collectively "Plaintiffs") subsequently filed their second amended complaint ("SAC," ECF No. 35). Before the Court is IPI's motion to dismiss the SAC with prejudice. (Mot., ECF No. 38.) Plaintiffs filed an opposition (Opp'n, ECF No. 39), to which IPI filed a reply (Reply, ECF No. 40). The matter came on for a hearing, at which time the Court took the matter under submission. (Min., ECF No. 43.) The Court now issues this decision and order DENYING the motion to dismiss the SAC and memorializes its reasoning as follows.

/ /

1

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The following facts are taken from the SAC, and the attached exhibits, which include various declarations from former IPI employees and Plaintiffs' Equal Employment Opportunity Commission ("EEOC") charges and right to sue letters. (ECF Nos. 35, 35-1– 35-13).

"Plaintiffs are [three] individuals with Turkish national origin and who were, at all relevant times, employees of IPI admitted to the United States under the H-2B temporary foreign worker program as construction workers to build the Imperial Palace casino/hotel resort in Garapan[.]" (SAC ¶ 4.) Genç started working for IPI in January 2020 as a foreman and leader of the welding and drywall team—with an employment certificate title of "Construction Carpenter." (*Id.* ¶ 5.) Gökçe started working for IPI in January 2020 as a plumber, plumbing foreman, and master of pipe installation—with an employment certificate title of "Plumber." (*Id.* ¶ 6.) Köş started working for IPI in January 2020 as an electrician—with an employment certificate title of "Electrician"—and was later promoted to foreman in June 2020. (*Id.* ¶ 7.)

Towards the end of June 2020, "when H-2B workers were negotiating with IPI to extend [their] contracts for another six months, one Taiwanese worker showed [Plaintiffs] his paycheck," which is when Plaintiffs "learned that the Taiwanese were being paid $23 an hour, nearly three times what IPI was paying [Plaintiffs], for the same work." (ECF Nos. 35-8, 35-10, 35-12.) Plaintiffs further learned that "the Italians were being paid $30 an hour, also for the same work that [Plaintiffs] were doing." (ECF Nos. 35-8, 35-10, 35-12.)

IPI then started to miss paydays around the same time in June 2020, and Plaintiffs filed a lawsuit with this Court in November 2020 pursuant to the Fair Labor Standards Act (FLSA). (ECF Nos. 35-8, 35-10, 35-12.) Plaintiffs were subsequently terminated on December 16, 2020. (ECF Nos. 35-8, 35-10, 35-12; *see* SAC ¶¶ 5-7.) Around the same time in December 2020,

Plaintiffs each individually filed a charge of discrimination with the EEOC, alleging discrimination on the basis of both national origin and retaliation.[1] (ECF Nos. 35-8, 35-10, 35-12.)

After receiving their respective right to sue letters from the EEOC, (ECF Nos. 35-9, 35-11, 35-13), Plaintiffs filed this class action lawsuit on January 20, 2022 against IPI and IPI's parent company Imperial Pacific International Holdings Ltd. (Compl., ECF No. 1.) Having received leave to amend their FAC after the Court granted IPI's motion to dismiss, (*see* Mins., ECF No. 17), Plaintiffs timely filed their SAC, alleging employment discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et. seq., and asserting the Court's original jurisdiction under Title VII. (SAC ¶¶ 1-2.)

Plaintiffs claim that "IPI engaged in a company-wide practice of employment discrimination, both intentional and systemic, on the basis of national origin, against Plaintiffs and a class of similarly situated Turkish employees/former employees as alleged in this Complaint." (*Id.* ¶ 1.) Even though the Turkish, Italian, and Taiwanese teams were each assigned floors that "were based on the same plan and the same productions," Plaintiffs assert that "those Taiwanese and Italian workers were paid by IPI at a wage rate significantly higher—as much as three times higher—than Plaintiffs and members of the class." (*Id.* ¶¶ 19, 51-52 (quoting Barut Decl. 1, ECF No. 35-6).) A former Turkish employee observed that while "Taiwanese and Italian workers doing the same job as he worked fewer hours (no overtime) each week[, they] were paid substantially more." (SAC ¶ 49.)

---

[1] Their retaliation claim formed part of the lawsuit in *Genc v. Imperial Pac. Int'l (CNMI) LLC*, No. 1:20-cv-00031, albeit under the FLSA.

Additionally, Plaintiffs contend that "[w]ithin each ethnic national team, all the construction workers were paid at the same rate, all foremen were paid at the same rate, and all supervisors were paid at the same rate." (*Id.* ¶ 25.) "IPI employed those Taiwanese and Italian workers to perform the same types of work that Plaintiffs and members of the class performed" and those "Taiwanese and Italian workers had the same or similar level of skills, qualifications, and experience as Plaintiffs and members of the class." (SAC ¶¶ 17-18.)

Fiden T. Hamo, a U.S. citizen that worked in general construction at IPI's construction site, observed the Turkish, Italian, and Taiwanese construction workers. (Hamo Decl. ¶¶ 2-6, ECF No. 35-3.) He states that "[t]here was no difference that [he] could see in the work that Turkish construction workers doing welding, masonry, carpentry, and electrical work were doing, as opposed to work that welders, mason, carpenters, and electricians from other nations were doing." (*Id.* ¶ 11.) Glenn Bell, project manager for a team of Italian construction workers, attests that while "[t]he nature and quality of work that the Turks did was comparable to the nature and quality of the work the Italians did . . . the Turks were paid approximately one-third the hourly rate as the Italians." (Bell Decl. ¶¶ 3, 9, 13, ECF No. 35-1.) Additionally, Bell states that "the Turks and Taiwanese were performing the same type of construction work, and the skill level, workmanship, and the nature and scope of the work cannot account for any disparity in pay rates between the Turks and the Taiwanese." (*Id.* ¶ 16.) Genç attests that "the work that Taiwanese welders and Italian welders, dry wall specialists, and carpenters [i.e. the Taiwanese and Italian construction workers] did . . . required no greater skill or training than the work that similar Turkish workers were doing. It was the same work that the Turks were doing. There was no difference." (Genç Decl. ¶ 10, ECF 35-7.) Senol Barut, who was a Turkish supervisor, states that all of his fellow supervisors, except one, were paid much more than he. (Barut Decl. 1, ECF No.

35-6.) Genç attests that "IPI asked us to support the Italians in drywall system installation, ceiling carpentry, and welding on the 14th floor[.]" (Genç Decl. ¶ 5.) He further provides that "[t]he Italians also were sent to other floors for aluminum curtain wall installation, and we assisted them in that work." (*Id.* ¶ 6.)

Further, Plaintiffs provide wage rates for the H-2B program from the Department of Labor (DOL). They list the wage range the DOL authorized for various construction worker positions such as plumbers and welders. (SAC ¶ 22.) Plaintiffs assert that because IPI paid Turkish employees minimum wage, they were paid below the range that the DOL had approved IPI to pay its H-2B employees. (*Id.* ¶¶ 20-23.)

Plaintiffs bring their Title VII claim on behalf on themselves and as a class action pursuant to Federal Rule of Civil Procedure 23(b)(3), seeking to represent an estimated class of 107 "persons of Turkish national origin who were employed by IPI under the H-2B visa program during 2020 and 2021." (SAC ¶¶ 66-72.)

In addition to suing IPI, Plaintiffs also sue Imperial Pacific International Holdings Ltd. under an alter ego theory. (SAC ¶¶ 3, 14). As relief, Plaintiffs seek: for the case to be expedited pursuant to 42 U.S.C. § 2000e-5(f)(5); class certification; compensatory and punitive damages; costs, expenses, and attorneys' fees pursuant to 42 U.S.C. 2000e-5(k); and any other such relief that is just. (*Id.* at 15.)

## II.   <u>LEGAL STANDARD</u>

To survive a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570

(2007)). The factual allegations need not be detailed, but a plaintiff must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. "For purposes of ruling on a Rule 12(b)(6) motion, the Court 'accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party.'" *P&G v. QuantifiCare Inc.*, 288 F. Supp. 3d 1002, 1010 (N.D. Cal. 2017) (quoting *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008)). Further "[a]t the motion to dismiss phase, the trial court must . . . draw all reasonable inferences in favor of the plaintiff." *Tracht Gut, LLC v. L.A. Cty. Treasurer & Tax Collector*, 836 F.3d 1146, 1150 (9th Cir. 2016) (citation omitted). In determining whether a motion to dismiss should be granted, there is a two-step process: first, "identify[] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

Generally, when ruling on a 12(b)(6) motion, a court may consider only the pleadings and limited materials, such as "documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice[.]" *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). If a court considers other evidence, "it must normally convert the 12(b)(6) motion into a Rule 56 motion for summary judgment, and it must give the nonmoving party an opportunity to respond." *Id.* at 907.

III.   **DISCUSSION**

The Court finds that Plaintiffs plausibly allege a prima facie case of Title VII discrimination. The differences that IPI cites are immaterial. Additionally, the SAC alleges plausible facts to show that each named Plaintiff was discriminated against. The Court further

finds the DOL statistics anecdotally supportive of the claim of Title VII discrimination. The facts alleging systemic discrimination also support the claim of discrimination. In reaching these findings, the Court first turns to the primary issue of Title VII employment discrimination.

> **A. Plaintiffs plausibly allege a claim for Title VII employment discrimination because they demonstrate other circumstances giving rise to an inference of discrimination.**

The Court is mindful that a plaintiff does not need to plead a prima facie case in order to survive a motion to dismiss. *McGary v. City of Portland*, 386 F.3d 1259, 1262 (9th Cir. 2004) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510-11 (2002)). The analysis at the motion to dismiss phase for an employment discrimination case is focused on whether there are "enough facts to state a claim to relief that is *plausible* on its face[.]" *United States v. Valdez-Novoa*, 780 F.3d 906, 916 n.1 (9th Cir. 2015) (quoting *Twombly*, 550 U.S. at 569-70) (noting the Supreme Court's holding that the plausibility standard is not contrary to its prior holding that an employment discrimination complaint does not need to contain facts establishing a prima facie case of discrimination). Nevertheless, district courts in the Ninth Circuit look to the elements of a prima facie case in analyzing the sufficiency of an employment discrimination complaint. *See Sablan v. A.B. Won Pat Int'l Airport Auth.*, No. 10-00013, 2010 U.S. Dist. LEXIS 130692, at *13, 2010 WL 5148202, at *5 (D. Guam Dec. 9, 2010) (citations omitted) ("[C]ourts are now looking to those elements to analyze a motion to dismiss—so as to decide, in the light of 'judicial experience and common sense,' whether the challenged complaint 'contain[s] sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face.""'"); *Carter v. Brennan*, No. 2:18-cv-00823 MCE AC (PS), 2018 U.S. Dist. LEXIS 172048, at *6, 2018 WL 4810808, at *2 (E.D. Cal. Oct. 4, 2018) (citations omitted) ("[T]he court must look to these elements [of a prima facie case of discrimination] to decide whether plaintiff's complaint as pleaded contains sufficient factual

matter, accepted as true, to state a plausible claim for relief."), *report and recommendation adopted*, No. 2:18-CV-00823 MCE AC(PS), 2019 U.S. Dist. LEXIS 11066, 2019 WL 296948 (E.D. Cal. Jan. 23, 2019).

To state an individualized claim for race-based disparate treatment under Title VII, a plaintiff must allege sufficient facts to show that: "(1) [plaintiff] is a member of a protected class; (2) [plaintiff] was qualified for [the] position; (3) [plaintiff] experienced an adverse employment action; and (4) similarly situated individuals outside [plaintiff's] protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004) (citations omitted); *see Campbell v. Haw. Dep't of Educ.*, 892 F.3d 1005, 1012 (9th Cir. 2018) (noting same). To satisfy this fourth prong on "similarly situated," the plaintiff "must demonstrate that he [or she] was similar to [the] proposed comparator 'in all material respects.'" *Sheets v. City of Winslow*, 859 F. App'x 161, 162 (9th Cir. 2021) (quoting *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006)). "[I]ndividuals are similarly situated when they have similar jobs and display similar conduct." *Vasquez v. County of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003).

At the motion hearing, IPI confirmed that it does not contest the first three elements of the prima facie case of discrimination. (*See also* Mot. 12 n.2.) As with the prior motions, this motion to dismiss turns on the fourth element in determining whether the SAC alleges a plausible claim of discrimination.

Plaintiffs cite to *Houle v. Walmart Inc.,* 447 F. Supp. 3d 261, 280 (M.D. Pa. 2020), for the contention that for a pay discrimination claim, complaints are "not required to identify any comparators who have received more favorable treatment than plaintiff." (Opp'n 4.) Despite this non-binding out-of-circuit district court case, courts from other circuits, including the Ninth, have

required complaints to identify similarly situated comparators for pay discrimination claims. *See Redwind v. W. Union, LLC*, No. 3:18-CV-02094-SB, 2019 WL 3069864, at *4 (D. Or. June 21, 2019) (recommending dismissal of pay discrimination claim because the plaintiff did not allege comparators were similarly situated), *report and recommendation adopted*, No. 3:18-CV-2094-SB, 2019 WL 3069841 (D. Or. July 12, 2019); *Harrington v. Lesley Univ.*, 554 F. Supp. 3d 211, 224 (D. Mass. 2021) (quoting *Smith v. Stratus Comput., Inc.*, 40 F.3d 11, 17 (1st Cir. 1994)) (dismissing complaint because the plaintiff failed to allege facts to demonstrate male colleagues were similarly situated). Nevertheless, as outlined by the Ninth Circuit, to prove a prime facie case of discrimination, plaintiffs must establish either that "similarly situated individuals outside [plaintiff's] protected class were treated more favorably, *or* other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Peterson*, 358 F.3d at 603 (emphasis added) (citations omitted).

Construing the pleadings in the light most favorable to and drawing all reasonable inferences in favor of Plaintiffs, the Court finds that the SAC plausibly states a claim that IPI discriminated against Plaintiffs and the proposed class members in paying them lower wages compared to their Italian and Taiwanese counterparts. Previously, this Court found that the FAC "d[id] not contain sufficient facts to plausibly allege that the Italian and Taiwanese are appropriate comparators." (Mem. Decision Granting Mot. Dismiss FAC 11 (citations omitted).) While the FAC stated that Plaintiffs were construction carpenters, plumbers, and electricians, it lacked any facts regarding other construction carpenters, plumbers, and electricians. (*Id.* at 10.) Now, Plaintiffs clarify that "[t]he material, relevant unit of comparison is the group, not the individual, because within each group – construction workers, foremen, supervisors – the pay was the same for all individuals of the same nationality." (Opp'n 5.) Contrary to IPI's claim that the SAC lacks

facts stating that "'groups' of construction workers, foremen and supervisors of the same national origin had the same wage rate" (Reply 5), the SAC asserts that "[w]ithin each ethnic national team, all the construction workers were paid at the same rate, all foremen were paid at the same rate, and all supervisors were paid at the same rate" (SAC ¶ 25.) As such, the Court uses the groupings of construction worker, foreman, and supervisor to determine whether the SAC plausibly alleges Title VII discrimination. *See generally Vasquez*, 349 F.3d at 641 ("Employees in supervisory positions are generally deemed not to be similarly situated to lower level employees."). At the hearing on the motion to dismiss the SAC, Defendant clarified that it does not contest the propriety of using the group classifications, but asserts the SAC should nevertheless be dismissed for failure to allege sufficient comparators. (*See also* Reply 5-6.) The Court therefore turns to whether Plaintiffs have stated sufficiently plausible facts in their SAC to state a claim for Title VII discrimination based on the fourth prong and Plaintiffs' hierarchal comparators, starting with the construction workers.

### 1. Construction Workers

Plaintiffs claim Title VII discrimination for the Turkish construction workers because there were pay disparities compared to other construction workers of different nationalities, despite the work being comparable or the same. Their SAC is supported by several declarations, including one from Hamo, a U.S. citizen that worked in general construction at IPI's construction site. Hamo states that "[t]here was no difference that [he] could see in the work that Turkish construction workers doing welding, masonry, carpentry, and electrical work were doing, as opposed to work that welders, mason, carpenters, and electricians from other nations were doing." (Hamo Decl. ¶ 11.) These statements sufficiently support the proposition that Taiwanese and Italian construction workers were similarly situated to the Turkish construction workers – they had similar jobs of construction workers and similar conduct in that they were "doing welding, masonry, carpentry, and electrical work." This conclusion is further buttressed by other declarations. Bell, project

manager for a team of Italian construction workers, attests that while "[t]he nature and quality of work that the Turks did was comparable to the nature and quality of the work the Italians did . . . the Turks were paid approximately one-third the hourly rate as Italians." (Bell Decl. ¶¶ 3, 9, 13.) Moreover, Bell states that "the Turks and Taiwanese were performing the same type of construction work, and the skill level, workmanship, and the nature and scope of the work cannot account for any disparity in pay rates between the Turks and the Taiwanese." (*Id.* ¶ 16.) Although Bell does not specify what group he was describing when comparing the Turks, Taiwanese, and Italians, it is a reasonable inference to conclude that he is referencing the construction workers that he supervised. *See Tracht Gut, LLC*, 836 F.3d at 1150 (citation omitted) ("At the motion to dismiss phase, the trial court must . . . draw all reasonable inferences in favor of the plaintiff.") Further, Genç concludes that "the work that Taiwanese welders and Italian welders, dry wall specialists, and carpenters [i.e. the Taiwanese and Italian construction workers] did . . . required no greater skill or training than the work that similar Turkish workers were doing. It was the same work that the Turks were doing. There was no difference." (Genç Decl. ¶ 10, ECF 35-7.) Based on the foregoing, the Court concludes that the Turkish construction workers were similarly situated to the Italian and Taiwanese construction workers, which satisfies the fourth element of the prima facie case. As such, the SAC states a plausible claim that IPI discriminated against the Turkish construction workers.

### 2. Supervisors and Foremen

Construing the SAC in the light most favorable to and drawing all reasonable inferences in favor of Plaintiffs, it is reasonable to conclude that IPI discriminated against the Turkish supervisors. As to supervisors, Turkish supervisor Barut states that all of his fellow supervisors, except one, were paid much more than he. (Barut Decl. 1.) While Barut details his own job duties,

(*id.*), he does not state whether Turkish and Taiwanese supervisors performed duties similar to his. However, based on the actual work performed, the Court finds there are sufficient similarities. Specifically, the SAC asserts that the Turkish, Italian, and Taiwanese teams were each assigned floors that "were based on the same plan and the same productions." (SAC ¶¶ 51-52 (quoting Barut Decl. 1).) This statement supports the similarly situated allegation by providing the missing link that the Taiwanese and Italian supervisors were doing the same work as the Turkish supervisors such that they were similarly situated yet being paid differently. Alternatively, these facts as alleged at least give rise to an inference of discrimination, which thus satisfies the fourth element of the prima facie case. Therefore, the SAC plausibly alleges that IPI discriminated against the Turkish supervisors.

In light of the discussion above, the Court concludes that the SAC plausibly alleges that IPI discriminated against the Turkish foremen, including the three named Plaintiffs. Genç attests that "IPI asked us to support the Italians in drywall system installation, ceiling carpentry, and welding on the 14th floor[.]" (Genç Decl. ¶ 5.) He further provides that "[t]he Italians also were sent to other floors for aluminum curtain wall installation, and we assisted them in that work." (*Id.* ¶ 6.) It is reasonable to infer that Genç's use of the term "we" includes Turkish construction workers that he oversaw as well as Turkish foremen. The SAC also reasserts that "IPI employed those Taiwanese and Italian workers to perform the same types of work that Plaintiffs and members of the class performed" and those "Taiwanese and Italian workers had the same or similar level of skills, qualifications, and experience as Plaintiffs and members of the class." (SAC ¶¶ 17-18.) Although Plaintiffs use the vague term "workers," it can apply to the context of the foremen. These drawn inferences along with the prior findings that IPI discriminated against the Turkish

12

construction workers and supervisors supports finding that the SAC raises an inference that IPI

discriminated against the Turkish foremen.

### B.  Each of the three named Plaintiffs have plausibly alleged individual claims of Title VII discrimination.

The Court must still analyze the individual claims of discrimination plead by each named

Plaintiff who are each foreman even though the SAC plausibly states a claim of discrimination

against all Turkish foremen in this case. *See Renati v. Wal-Mart Stores, In*c., No. 19-cv-02525-

CRB, 2019 U.S. Dist. LEXIS 185486, 2019 WL 5536206, at *6 (N.D. Cal. Oct. 25, 2019) (citing

*Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1156 (9th Cir. 2010)) ("Individual plaintiffs must

show that they themselves were discriminated against."). "It is true that evidence of a pattern or

practice of discrimination may, in a class action, be sufficient to prove a Title VII claim, 'even

absent proof of losses to specific individuals." *Id.* (quoting *Chin v. Port Auth. of N.Y. & N.J.*, 685

F.3d 135, 147 (2d Cir. 2012)). However, "every circuit to consider the question has held that

individual Title VII plaintiffs cannot prevail based only on pattern or practice evidence" because

"extending the pattern-or-practice method of proof to individual cases would impermissibly

'relieve the plaintiff of the need to establish each element of his or her claim.'" *Id.* (quoting *Chin*,

685 F.3d at 149-50.)

Here, construing the pleadings in the light most favorable to Plaintiffs, the SAC sufficiently

states a claim of discrimination against all three Plaintiffs as foremen. Plaintiffs assert that the

Italian foremen earned $50 an hour,[2] (Bell Decl. ¶ 11), yet they only earned $10.50 an hour as

---

[2] Conversely, in their EEOC charge forms, Plaintiffs state that "the Italians were being paid $30 an hour, also for the same work that we were doing." (ECF Nos. 35-8, 35-10, 35-12.) While the Court is "not . . . required to accept as true allegations that contradict exhibits attached to the Complaint[,]" *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (citation omitted), the Court is mindful that the statements in the EEOC charge forms were made before Bell's statements were made. Further, Plaintiffs' and Bell's statements still support the allegation that IPI discriminated against the Turkish by paying their Italian counterparts more – Plaintiffs just provided a more conservative estimate.

13

foremen (ECF Nos. 35-8, 35-10, 35-12.) Additionally, they state that "the Taiwanese were being paid $23 an hour, nearly three times what IPI was paying us, for the same work." (*Id.*) It is a reasonable inference to conclude that Plaintiffs were comparing themselves, as Turkish foremen, to the Taiwanese foremen. Also, as described above, the SAC describes the similar conduct among the Turkish, Italian, and Taiwanese foremen. Therefore, the Court concludes that the SAC plausibly states that individual Plaintiffs Genç, Gökçe, and Köş were each discriminated against.

### C.  Any differences IPI alleges are immaterial.

IPI argues that there are significant differences between the Turkish, Italian, and Taiwanese workers such that they cannot be similarly situated, such as the exclusivity of electrician and plumber positions to only the Turkish; the Turkish workers' ability to earn overtime pay; and the Turkish workers' representation through a third-party recruitment agency. (Mot. Dismiss 14-15.) At this early stage of litigation, the Court finds the SAC alleges sufficient facts to plausibly assert that IPI discriminated against the Turkish construction workers, foremen, and supervisors. Moreover, the distinctions that IPI highlights do not appear to be material.

In affirming a grant of summary judgment in favor of defendant Major League Baseball (MLB), the Ninth Circuit found that the plaintiffs, Caucasian or Latino retired professional baseball players, "failed to demonstrate that they are similarly situated in all material respects to the former Negro League players they assert are receiving more favorable treatment" of receiving benefits under the Negro League Plans. *Moran*, 447 F.3d at 751, 755-56. The Ninth Circuit identified a material aspect when it noted that "in order to qualify for the benefits under the Negro League Plans, the players to whom the appellants seek to equate themselves must have played in the Negro Leagues-a qualification that the appellants indisputably lack." *Id.* at 756.

Here, it is unclear how any of the distinctions IPI highlights between the Turkish workers and the Italian and Taiwanese workers are material. (Mot. Dismiss 14-15). The comparators here are among three groups: construction workers, supervisors, and foremen. The disparate treatment under Title VII is the inequitable base rate IPI applied among the national groups, not the opportunity for all the workers to earn the same amount of money per pay period. Plaintiffs clarify that even though "Taiwanese and Italian workers doing the same job as he worked fewer hours (no overtime) each week but were paid substantially more." (SAC ¶ 49.) So even assuming that IPI paid the Turkish a lower wage because they were allowed to work overtime, this should not result in the Turkish being treated disparately because they still earned substantially less.

At the motion hearing, IPI emphasized that the difference in skills and qualifications among the groups as outlined in the SAC demonstrates that the Turkish are not similarly situated to the Taiwanese and Italian. (*See also* Reply 7.) For example, IPI notes that the Plaintiffs allege only the Turks had electricians and plumbers. (Mot. 14 (citing SAC ¶ 34).) Plaintiffs counter that because IPI did not differentiate pay based on specialty, these differences are immaterial. At this stage, the Court finds that the differences in skills and qualifications are not material because Plaintiffs allege discrimination based upon each class of workers, regardless of specialization. Plaintiffs assert that "[w]ithin each ethnic national team, all the construction workers were paid at the same rate, all foremen were paid at the same rate, and all supervisors were paid at the same rate." (SAC ¶ 25.) In support of this, Plaintiffs allege that the Italian construction workers were all paid $25.00 per hour and the Italian foremen were paid $50.00 an hour – "There was no distinction in pay based on specialties – carpenters, welders, plumbers, etc." (*Id.* ¶ 28.)

Moreover, these holes that IPI is attempting to poke in Plaintiffs' prima facie case appear to be legitimate, nondiscriminatory reasons for the alleged discrimination. *See Fernandez v. Wynn*

*Oil Co.*, 653 F.2d 1273, 1275 (9th Cir. 1981) (acknowledging superior qualifications as a legitimate and nondiscriminatory reason for adverse employment action). It is inappropriate for a court to consider "legitimate, nondiscriminatory reasons proffered by a defendant at the pleading stage" because "[d]oing so would improperly invoke the *McDonnell Douglas* burden-shifting framework, which 'is a summary judgment "evidentiary standard, not a pleading requirement."'" *Seyed Mohsen Sharifi Takieh v. Banner Health*, 515 F. Supp. 3d 1026, 1044-45 (D. Ariz. 2021) (quoting *Astre v. McQuaid*, 804 F. App'x 665, 667 n.3 (9th Cir. 2020)).

Ultimately, the SAC plausibly alleges that IPI discriminated against the Turkish construction workers, foremen, and supervisors.

**D. The statistics by the Department of Labor establish circumstantial and anecdotal evidence that Plaintiffs suffered Title VII discrimination.**

Plaintiffs' SAC also plead new facts regarding DOL statistics. (SAC ¶¶ 20-24, 35.) Specifically, Plaintiffs list the wage range the DOL authorized for various construction worker positions such as plumbers and welders. (*Id.* ¶ 22.) Plaintiffs assert that because IPI paid Turkish employees minimum wage, they were paid below the range that the DOL had approved IPI to pay its H-2B employees. (SAC ¶¶ 20-23.) Next, Plaintiffs claim that "[t]he statistics on IPI H-2B approvals by USDOL (SAC ¶¶ 20–23) show that the basic wage rate for any of the approved categories never was larger than a factor of 2 (e.g., construction carpenter: $15.48–$28.95) and typically was closer to a factor of 1.5 (e.g., mason: $14.92–$22.00)." (Opp'n 7.) At the hearing, Plaintiffs' counsel asserted that the DOL range of appropriate wages for workers accounts for differences in skills and qualifications. For example, a highly skilled and qualified mason should earn no more than 1.5 times more than a novice mason. So even assuming that IPI paid Italian construction workers more than the Turkish construction workers because the former were more qualified, the Italians should not be earning three times more. Rather, Plaintiffs assert that the pay

difference was not due to a difference in qualifications, but because of discrimination. The Court finds that this additional information supports the finding of plausibility of discrimination as it is strong circumstantial and anecdotal evidence of how IPI paid the Turkish H-2B workers substantially less than H-2B workers recruited from Italy and Taiwan.

### E.  Facts alleging systemic discrimination establish circumstantial and anecdotal evidence that Plaintiffs suffered Title VII discrimination.

"In a discriminatory treatment class action, plaintiffs have the burden of proving by a preponderance of the evidence that sex discrimination was defendant's 'standard operating procedure' maintained through systematic intentional discrimination." *Penk v. Or. State Bd. of Higher Educ.*, 816 F.2d 458, 463 (9th Cir. 1987) (citations omitted). "To establish the requisite discriminatory intent plaintiffs may offer statistical, nonstatistical, and anecdotal evidence." *Id.* Here, Plaintiffs assert that "IPI engaged in a company-wide practice of employment discrimination, both intentional and systemic, on the basis of national origin, against Plaintiffs and a class of similarly situated Turkish employees/former employees[.]" (SAC ¶ 1.) Specifically, Plaintiffs allege that IPI paid the "Taiwanese and Italian workers . . . at a wage rate significantly higher—as much as three times higher—than Plaintiffs and members of the class." [3] (*Id.* ¶ 19.) This assertion is further supported by the plausible claims of discrimination against the Turkish construction workers, foremen, and supervisors as discussed above. As such, the SAC plausibly asserts that it was IPI's standard operating procedure maintained through systematic intentional discrimination to pay Plaintiffs and the proposed class members less than their Italian and Taiwanese counterparts.

---

[3] For the first time, in their opposition, Plaintiffs state that they used "the term 'workers' to mean construction workers." (Opp'n 1 n.1.) However, there was not a similar explanation in the SAC, such that the Court does not conclude the term "workers" as used in the SAC to mean construction workers.

IV.    <u>**CONCLUSION**</u>

Based on the foregoing, the Court DENIES IPI's motion to dismiss (ECF No. 38) the SAC with prejudice because Plaintiffs' SAC alleges sufficient facts to plausibly show that IPI discriminated against them and the proposed class of 107 Turkish H-2B workers.

SO ORDERED this 20th day of June, 2023.

_____
Ramona V. Manglona
Chief Judge